REGAN, Judge.
Plaintiff, Mabel Williams, the common, law wife of the decedent, Ernest Williams, instituted this suit, as the beneficiary, against the Equitable Life Assurance Society of the United States and Melvinia Williams, sister of Ernest Williams, endeavoring to enjoin the Equitable Life Assurance Society from paying the proceeds of a group life policy issued to Williams, in the amount of $2,000 to Melvinia. Williams.
Counsel for Melvinia Williams filed exceptions of no right or cause of action and further excepted to plaintiff’s petition on the theory that the causes of action therein set' forth were inconsistent, therefore, plaintiff should be ordered to elect, both of: which were overruled.
*601 The Equitable Life Assurance Society of the United States filed an interpleader under the terms of Act 123 of 1922, as amended, LSA-R.S. 13:4811 et seq., and deposited the proceeds of the policy in the Registry of the Civil District Court for the Parish of Orleans.
Plaintiff, Mabel Williams and the alleged beneficiary, Melvinia Williams, both answered the interpleader and claimed the proceeds of the policy as the legal beneficiary thereof.
After a trial on the merits, the Equitable Life Assurance Society of the United States was discharged from its obligations created by virtue of the contract of insurance with decedent and Melvinia Williams, his sister, was decreed, the legal beneficiary thereof and Mabel Williams’ suit was dismissed. Hence, this appeal by Mabel Williams.
In order to circumvent repetitious designation of parties plaintiff and defendant, we shall hereinafter apply the appellation plaintiff to Mabel Williams and defendant to Melvinia Williams.
The record reveals that Mabel and Ernest Williams initiated their relationship of husband and wife, without the benefit of matrimony, on or about February 5, 1934. The group policy was issued to Williams by the Equitable Life Assurance Society on February 24, 1943, through the Flintkote Company, his employer. On April 24, 1949, Williams became critically ill, which illness was subsequently diagnosed as advanced pulmonary tuberculosis and was confined to his home in 2330 Sixth Street, which consisted of two rooms; on April 25, 1949, he or a sister, who resided in the neighborhood, called Melvinia Williams, also a sister to visit his home for the ostensible purpose of assisting in caring for Williams; on Wednesday morning, May 4, 1949, defendant insists that Ernest' Williams requested Hebert Freeman (although Freeman testified that both Ernest and Mel-vinia Williams made the request) to ask the union’s steward, Arthur Ester, also employed by the Flintkote Company to obtain a change of beneficiary form from the offices of the Flintkote Company and bring it to him; on May 4, 1949, Ester obtained this form from W. A. Beason, personnel manager of the Flintkote Company; on the same afternoon Ester, accompanied by Mitchell Sylvester and Sam Brack, also members of the union and employees of the Flintkote Company, visited the home of Ernest Williams. Defendant contends that Ernest Williams then advised them that it was his intention to change the beneficiary of this policy from Mabel Williams to Melvinia Williams and that thereafter in conformity with the desire of the decedent, the name of Melvinia Williams, her relationship and her address was written on the reverse of the form by Ester; that Ester, because of the illiteracy of Williams, signed the name of Ernest Williams on the blank form in the presence of Sylvester and Brack; Williams then placed his cross mark or “x” after his surname.
Plaintiff, on the other hand, contends that the document was not executed by the decedent because it was not his desire to change the beneficiary and further that he was neither physically nor mentally capable of voluntarily executing this change of beneficiary.
On Thursday, May 5, 1949, it appears that Ester returned the document to Bea-son, who wrote his name “W. A. Beason” as a witness to the “x mark” of Williams, in the blank space provided therefor following the printed words “Signed in the presence of” and then inserted the name of the new beneficiary, Melvinia Williams, in the body of the document, which was subsequently forwarded to the accounting department of the Flintkote Company. Upon receipt thereof that department noted the change of beneficiary on the insurance record card of Ernest Williams.
On Friday, May 6, 1949, Ernest Williams died. Several days thereafter, Sylvester, Brack and Ester, upon the request of either Beason, or Kidd, also an employee of Flint-kote Company, signed as witnesses to Ernest Williams’ alleged mark which had previously been inscribed in the document. On Monday, May 9, 1949, the proof of death, executed 'by Beason on behalf of the *602 Flintkote Company, recognized Melvinia Williams, as the sole beneficiary of the policy. In conformity therewith the Equitable Life Assurance Society also recognized Melvinia Williams as the beneficiary, and intended paying her the proceeds of the policy, but were enjoined therefrom by this suit.
The only question posed for our consideration is one of fact and that is did Ernest Williams actually execute this change of benefici-ary from Mabel Williams to Mel-vinia Williams. Witnesses Ester, Sylvester and Brack say that Williams did execute this change of beneficiary.
The record reflects that Ester, Brack and Sylvester visited the domicile of Ernest Williams on Wednesday, May 4, 1949, around four o’clock in the afternoon and, at that time, there were present,, in the two room domicile in addition to Williams, who was confined to his bed, Mabel Williams, his common law wife, and Melvinia Williams, his sister; Ester asked Melvinia Williams, the sister, who had possession of the certificate of insurance and he was informed that Mabel 'had it, whereupon he asked Mabel for the certificates and “she got up and showed them to me.” On direct examination Ester testified in response to the'question “was she aware or did you tell her anything about what you needed the policy for?” “No, sir, I didn’t tell her anything”, although on cross-examination he testified in response to “you told Mabel that the reason you wanted the policy was to get him in the hospital”, “I didn’t say to get him in. Q. But you were talking about the policy and the hospital to Mabel ? A. That is right.” On redirect examination he testified in response to the following question “When you asked her for the policies or the certificates in order to effect the change, did you tell her the purpose for which you wanted it?” “Yes, sir, I told her I wanted to see why they did not take him in the hospital.”
Ester, Brack and Sylvester each possessed an antagonistic version of Williams’ bed posture when he is alleged to have effected the change of beneficiary. One witness laboriously elucidated that the back or head of the decedent was supported by pillows and he signed the document while it rested in his lap; another related that he was “flat on his back” while the form rested on the bed at his side; and the third stated that the form was signed while it rested on Williams’ stomach.
The record is replete with surreptitious inconsistencies in the testimony of these witnesses, however, each was positive that the document “x-ed” by Williams was .“in blank.” It contained not one written word at the time that Williams is alleged to have executed it. Nor did any of these witnesses, at that time, attest to Williams’ mark, all three having signed the document approximately one week after it had been returned to the Flintkote Company and one week after the death of Williams. In fact, it was not until Mabel Williams began to press her claim for the proceeds of the policy that Ester, Brack a'nd Sylvester were called upon by Kidd of the Flintkote Company to compose statements for the benefit of the insurance company and to sign as witnesses to Williams’ “x mark” on the change of beneficiary form.
Ester testified that he wrote the name of “Mrs. Melvinia Williams, 2330 Sixth Street, New Orleans, La.” on the reverse of the form in his own handwriting in the presence of Brack and Sylvester, however, Brack testified that although he was present at the time the document was “x-ed” by Williams, he did not see Ester write anything on the reverse thereof.
The record further reflects that the only witness to the “x mark” of Williams which appeared on the document before the death of Williams, was that of W. A. Beason, who defendant concedes was not present when the “x mark” was allegedly executed by Williams, • but was signed by Beason on May 5, 1949, -in the offices of the Flint-kote Company.
Defendant, Melvinia Williams, testified that although she was present in the home of Williams on the day in question, she did not see her brother place his “x mark” on the change of beneficiary form.
*603 Mabel Williams also testified that she was present and moving between the two rooms and that she neither saw Williams execute the change of beneficiary form, nor did she overhear any discussion relating thereto. In fact, she said that when Ester, Brack and Sylvester arrived, Williams was so desperately ill that he was unable to discuss or comprehend anything that may have transpired.
Dr. Philip A. Boudreaux testified that 'he visited Williams on three occasions, April 25, April 28 and May 1, 1949, and that “he was quite ill, extremely toxic and very cloudy mentally, 'and his condition as I saw him, had been getting worse every time that I saw him.” In response to the question “when you saw him on May 1st, 1949, would you say that, in your opinion he was unable to perform any physical or mental act — any legal act?” 'he said, “Well, I would say no, that it was very hard to get anything out of him at the time. Pie was not mentally alert * * *, pretty nearly a semi-coma. He was not definitely so that you could not arouse him, but he was hard to understand and he would not answer any questions. * * * He had fever. I couldn’t tell you the exact amount of his temperature, but it was quite high, about 103 degrees would be about an estimate.”
The doctor’s evaluation of Williams’ condition is further verified by the lay appreciation thereof by Mabel Williams, who testified that the decedent did not appear to know what he was doing and was delirious from the fever; that although he was unable to get out of bed, he frequently requested that she procure his “lunch pail and clothes because he had to go to work.”
In connection with the alleged execution of the change of beneficiary, it is interesting to reiterate that Ernest Williams could not sign his name. On each occasion which arose wherein it devolved upon him to execute any document, he made his mark; however Ernest Williams did not make an “x” mark, but made a mark which bore the general characteristics of a “plus” mark. This conclusion is fortified by an analysis of his mark which is inscribed on an application for a loan and on various pay checks received from the Flintkote Company and endorsed by the decedent. These documents reflect that Williams inscribed thereon a “plus mark” as distinguished from the “x mark” which is reflected as his signature on the change of beneficiary form. The “x mark” on the form is sharp, smooth, continuous and regular and creates the appearance of having 'been inscribed by a literate person and obviously does not reveal the slightest indication that it was executed on May 4, 1949 by the illiterate and unsteady hand of a very ill man, lying on the flat of his back, who died two days later on May 6, 1949 of advanced pulmonary tuberculosis.
We have made a diligent examination of the evidence contained in this record and we are of the opinion that Ernest Williams did not execute the change of beneficiary from Mabel Williams to that of 'his sister, Melvinia Williams.
“The concubine of the insured may recover on a life insurance policy in which she is named as the beneficiary.” Woodson v. Provident Life & Accident Insurance Company, 1942, La.App., 5 So.2d 387, 389.
For the reasons assigned the judgment appealed from is annulled, avoided and reversed 'and it is now ordered that there be judgment herein in favor of the defendant, Equitable Life Assurance Society of the United States, decreeing that said Equitable Life Assurance Society of the United States is relieved of all liability on the policy of insurance issued by it on the life of Ernest Williams.
It is further ordered, ‘adjudged and decreed that there be judgment herein in fav- or of Mabel Williams, recognizing her as the beneficiary of the policy of insurance issued by the Equitable Life Assurance Society of the United States on the life of Ernest Williams and declaring the said Mabel Williams to be entitled to the sum of $2,000 deposited in the registry of the Civil District Court for the Parish of Orleans by the Equitable Life Assurance Society of *604 the United States, together with all interest due thereon.
It is further ordered, .adjudged and decreed that the claim of Melvinia Williams be and the same is hereby dismissed, Mel-vinia Williams to pay all costs of Mabel Williams and the Equitable Life Assurance Society of the United States.
Reversed.